We will hear argument first this morning in case number 21-869, Andy Warhol Foundation v. Goldsmith. Mr. Martinez? Mr. Chief Justice, and may it please the Court, both courts below agreed, and Goldsmith doesn't dispute, that Warhol's print series can reasonably be perceived to convey a fundamentally different meaning or message from Goldsmith's photograph. The question in this case is whether that Our answer is yes. Warhol's transformative meaning puts points on the board under Factor One of the Four-Factor Balancing Test. Goldsmith and the Second Circuit say no. Warhol's new meaning is categorically irrelevant and can't be considered as part of Factor One or any other factor. I want to emphasize three points. First, the precedent supports us. Campbell unambiguously requires an examination of meaning or message. Google reaffirms that test and cites Warhol's soup cans as a paradigmatic example of when it's satisfied. Goldsmith's test is at odds with both cases. Second, our approach, unlike Goldsmith's, maintains a balance between protecting artists' rights to monetize their works and encouraging new and important follow-on expression. We give follow-on artists credit for innovation at Factor One while recognizing that Factor Four and the other factors will sometimes cut decisively the other way. Goldsmith's necessity test, by contrast, upends that balance. It banishes transformative meaning from the equation altogether, and by doing so, it violates 107's text, contradicts precedent, and undermines copyright's key goal, promoting creativity for the public good. Finally, the stakes for artistic expression in this case are high. A ruling for Goldsmith would strip protection not just from the print series, but from countless works of modern and contemporary art. It would make it illegal for artists, museums, galleries, and collectors to display, sell, profit from, maybe even possess a significant quantity of works. It would also chill the creation of new art by established and up-and-coming artists alike. These results are repugnant to copyright and to the First Amendment. You should reject them. We ask you to reaffirm Campbell and reverse the decision below. Could you give us an example of any follow-on work that fails your test? Sure. I think a classic example would be a book-to-movie adaptation. I think that would be a follow-on work. It would be a derivative work. I think if someone were to try to do that, I think that the original creator, the author of the book, could very easily assert that that was not fair use, and would have a winning case under Factor 4, and probably also under Factor 1, and certainly that would be a kind of classic example of a follow-on work that would not count. Why? I mean, derivative works are generally in a different medium, and almost all of them, even a dramatization on theater, or even a motion picture, or a sequel, they add something new according to your definition in your brief, so why shouldn't they be protected as well, according to your theory? Yeah, I think there's a Factor 4 issue and a Factor 1 issue. I think the most obvious problem would be a Factor 4 problem for the person who's trying to copy or create the movie adaptation. I'm sorry, I read Factor 1. The purpose and character of the use, including whether such use is of a commercial nature, or is for non-profit educational purposes. So what's the use here? I think I have to look at a use under 1 as well. So is the use the creation of the Prince series by Warhol? Is it the 2016 license of the Orange Prince? That factor, I think, is telling me to look at a use. So which use are you looking at? So we think that both uses are directly implicated in this case. I know there's a significant amount of confusion between our side and the other side on this, so I'd like to try to clarify it. This case came about because Ms. Goldsmith contacted the Foundation, asserted that the original Warhol works were infringing, demanded a quite substantial seven-figure sum of money, and also demanded the copyrights in the work. I'm putting that aside. They can tell us whether they're claiming. I think they're out of the statute of limitations, so they can't claim that. So I think the only thing they can claim under the statute is the 2016 license. Respectfully, Your Honor, that's not right, because what they claimed in their complaint, and this is at JA 120-121, was that they said that we were not allowed to invoke our copyright in the works. And that wasn't just a past question that's sort of like water under the bridge because of the statute of limitations. That has ongoing significance. So then I want to break them down. Assume that it's the creation. I understand your argument. It was a painting. It was a comment on consumerism. If that's all he did, that's one thing. But let's look at the 2016 license of Orange Prince, which is what I thought this case was about. But putting that aside, assume it's that. Okay. Assuming that we're just talking about that piece of the case, the licensing use. Even with respect to the licensing use, you'd still need to look at factor one, which would look at the purpose and character of the use. And that would certainly encompass the fact that Warhol's use, the image that's being licensed, was transformative and infused a new meaning or message on top of Goldsmith's original work. That I give you, I spot you. It should be considered. The Second Circuit didn't. But then what do I do with the rest of factor one, the purpose and use and character of the use? Because that's not just up to the author. That's up to what use was made of Orange Prince. It was a highly commercial use. Goldsmith also licensed her photographs to magazines, just as Warhol's, as Faith did. So how is it that your 2006 license and Goldsmith's photographs do not share the same commercial purpose? Well, I think that it's true that there is a commercial purpose, and so that might be a factor that would cut against us when assessing factor one. We think that the quite substantial and, in our view, undisputed transformation in meaning or message would show that. We have to look at the context of the use. I think you would look at all the factors. But again, Your Honor, I think your point, it's not a small point to say that the Second Circuit got this wrong by banishing transformative meaning or message. Assume that it got it wrong. The question is... How would we still win? I thought your brief was arguing, and you seem to be arguing something different today, that the transformation standing alone gives you factor one. Right. And I don't see how that can be. Your Honor, I think that's... Let me clarify our position. Our position is that factor one has to encompass the new meaning or message. We do not deny that there are other considerations that may bear on factor one. We think the district court below correctly recognized that the transformative meaning or message was so significant here that that would mean that we win under factor one, and in fact, you know, for the other reasons under the other factors that we also win the whole case. If you disagreed with us on that, I think what you could do is make very clear that the Second Circuit's banishment of meaning or message from the inquiry was wrong. You could send it back down to them. I think you should say that the transformation of meaning or message here was substantial. But if you thought that other factors had to be weighed, you could send it back down to the district court or the Second Circuit to reweigh those. Mr. Martinez, let's suppose that, and I think you can do this with technology, instead of the photograph, you put a little smile on his face and say this is a new message. The message is Prince can be happy. Prince should be happy. Is that enough of a transformation? The message is different. I think you would certainly have to consider the new meaning or message as part of the inquiry. And so if the question is whether that would be like categorically irrelevant, the answer is no. And I think the Second Circuit would not even consider it, wrong. I think, though, Your Honor, you're sort of suggesting, I think correctly, that there might be different degrees in transformation that might make a difference in the analysis. We would agree with that. Well, what I guess I'm trying to suggest is that there may be nothing left to the original author for derivative works. I mean, if that's not a derivative work, it's hard to see what would be. Well, I think you would do two things. First, at factor one, you would have to look at the degree of transformation and meaning or message. I think that that wouldn't be dispositive of the fair use question as a whole, though, because I think you would then look at factor four, and you would really have to look at whether the market for the new work is in a real substantial way is going to be a market substitute or compete with either the original work or the potential derivative uses of the original work by the original author. So we think we're not denying that factor four is relevant here. We're just that for purposes of factor one, you certainly wouldn't ignore the transformative meaning or message for purposes of that factor. It just needs to be considered as part of a holistic analysis. Can I take you back, Mr. Martinez, to your answer to Justice Thomas's question? Because you said, well, the classic example of non-transformative work would be a movie from a book. And indeed, we expect Hollywood, when it takes a book and makes a movie, to pay the author of the book. I think movie makers might be surprised by the notion that what they do can't be fundamentally transformative. I mean, mostly movies are tons of new dialogue, sometimes new plot points, new settings, new characters, new themes, you would think, new meaning and message. So why is it that we can't imagine that Hollywood could just take a book and make a movie out of it without paying? First of all, I certainly agree with your bottom line conclusion that you can't just take a book and make a movie out of it. I think the question is, how do you get there, and how do the different factors play in? We think two factors are relevant. Factor one, factor four. The other factor is probably also relevant, but the factor one and four may be the most relevant. With respect to factor one, we would say that the normal sort of book-to-movie transition, we don't think that the necessary sort of changes in the form from the written word into a movie, that that would inherently be a change in meaning or message. We think, actually, in most cases, the change from a book to a movie wouldn't have a different meaning or message, or if it did, it would be very slight. I think the more fundamental reason, though, why the book-to-movie adaptation would not be fair use is factor four, because the classic thing, if you're an author, a successful author, the most natural derivative market, the derivative use of your work and the potential market for your work, you sell a million copies of your book, the next thing you want to do is make a movie based on the book. That's like the movie a year before you make it. That would be interfering with the market for your potential market. Isn't the classic thing with a photograph that it'll be used in stories about the subject of the photograph, and therefore competing in the same market that this adaptation was used in, namely it was used in a story about Prince, not a story about Warhol, and at least from the key distinction. I don't think so, Your Honor. I don't think, and I think the Second Circuit actually agreed with us on this. They said that the primary work itself would not actually compete as a market substitute with Goldsmith's photograph, and I think that's exactly right. I don't think that the standard use of Goldsmith's work would be to create Warhol-style transformed celebrity fine art portraits in the way that Warhol did. And I think, in any event, if you had concerns about that, it's really a factor four. I mean, I guess this goes to the use, but it's being used in a story about Prince, just like the 84 story in Vanity Fair. You mean the story like the Vanity Fair article? Well, I guess what I would say is that if you think that that's a competing sort of substitute, that's a factor four inquiry. I think that the court below recognized that the Warhol work did not compete as a market substitute at factor four with the Goldsmith photograph, and this is really a factor one case. Sorry, can I have you focus in on factor one, because I sort of thought that that's really what we were focused on here. And you've continued to say that meaning and message, you think the problem with the Second Circuit is that they banished meaning and message from that factor. I understand that, but it doesn't help me to or character and character inquiry in factor one. So I could see, for example, as we evaluate the purpose and character of the use, that you might say, well, this is a new purpose insofar as our purpose was to provide a new meaning and message. So it's sort of embedded in the consideration of purpose, or this has a new character because it conveys a new meaning and message. Is that how you're doing this? I didn't see you filtering meaning and message through purpose and character. Thank you, and thank you for focusing on the text. Let's talk about the text. The text talks about purpose and character. I don't think there's any real dispute about what those words mean. We think that the transformative meaning or message directly affects both purpose and character. So let me just take them one at a time. With respect to purpose, we're talking about visual art, and visual art is intended to be seen by audiences. A major purpose of visual artists is to communicate through their work, when they put the work in front of the audience, certain meanings or messages to that audience. Can I just stop you for a second? Are you just sort of hypothesizing about that, or are you saying that was actually the purpose of this use in this situation? Anybody can sort of say after the fact, oh, a purpose of visual art is X. I thought this was about the purpose of the use in this particular case. I don't think it's disputed, and I think it's common sense that artists like Walhall intended their works to be seen, and were intending to communicate messages through their works. So it wasn't the purpose of this particular use to illustrate the Vanity Fair article, and this is where the commercial part comes in. That wasn't the purpose? That was part of the purpose, if you look at it at a higher level of generality. We're not saying that's irrelevant, but I think even when you look at the actual article it was illustrating, it was illustrating an article entitled Purple Fame that was all about Prince's emerging celebrity iconic status. And so it's perfectly natural to illustrate that article that you would want a Walhall-type work that has, as its meaning or message, a picture of Prince that shows him as the exemplar of sort of the dehumanizing effects of celebrity culture in necessarily changes the purpose of the original work. As to character, just briefly, character just means a quality, trait, or attribute, and certainly if the message of the work changes, that would be a quality, trait, or attribute of the work. And I think the problem with Goldsmith's side is that they're essentially arguing that a new meaning or message has nothing to do with purpose, doesn't change the character of the work, and it's just the only level of generality you can look at those things is at the level of, well, they're both portraits of Prince, they must be the same. And I don't think that's a common sense or appropriate way to look at this. Sorry, just saying. How is a court to determine the purpose of meaning, the message or meaning of works of art like a photograph or a painting? Should it receive testimony by the photographer and the artist? Do you call art critics as experts? How does the court go about doing this? So, Justice Alito, I think that the short answer is I think the court can do it in exactly the same way that this court and the lower courts did in the Campbell case. So in the Campbell case, the issue was parody, but one of the issues in the case was whether the Two Live Crew song was, in fact, a parody. In order to do that, the court needed to assess what the meaning or message of the work was. And Justice Souter, in his opinion for the court at page 583, he sort of like does his own analysis. So I think you could just look at the two works and figure out what you think as a judge. But I think that more likely in most of these cases, the way that they've been put forward, in addition to the works themselves, is put forward evidence. Sometimes it's evidence from the creator, both creators. Sometimes it's expert evidence. Sometimes it's other kinds of evidence. But that's sort of like the standard run-of-the-mill way that litigants in these copyright cases try to argue about and establish meaning or message. And we think that's totally appropriate in this circumstance. You make it sound simple, but maybe it's not so simple, at least in some cases, to determine what is the meaning or the message of a work of art. There can be a lot of dispute about what the meaning or the message is. Some people would say it's not necessarily the meaning or the message that the artist had in mind. I don't know, if you called Andy Warhol as a witness, what would he say was the purpose of his, the message or meaning of his creation? I wish I could answer that question. He's not with us, as you know, Your Honor. But I will say this about the problem that you've pointed to, which is a real concern. I understand why it's a real problem. I think that the answer to that problem is solved by Campbell. Because Campbell does not say that the court or the fact finder needs to figure out the meaning or message. It says it needs to figure out whether a new meaning or message could reasonably be perceived. And that creates a bit of latitude, of sort of wiggle room that defers to the fact that there might indeed be, you know, a bunch of different reasonable interpretations of art. You say in your reply brief that the new thing has to be important, correct? That's taking that from Google, new and important. And how do you go about thinking about what's important? Well, I think in the context of copyright law, you would look at important in light of the objectives of copyright law. And here it's promoting creativity for the public good. And so you would look at that just the same way that Judge LaValle talked about in his decision, and I think the way that both the Campbell and Google courts did. And what Google said, right after it said... But what's the difference in the follow-on work that when we look at it, we can say, well, that's an important difference that does something that we really need to hear or to see? So what the court said in Campbell was it equated the new or important inquiry with a serious inquiry into transformative meaning or message. And when Campbell uses that language, new and important, it's immediately following the sentence where it's quoting... I'm sorry, when Google uses that phrase, it's immediately following the place where it quotes the language in Google in Campbell that says new meaning or message count. Counsel, going back to your answer to Justice Kavanaugh and now to Justice Kagan, what's the right level of generality? You keep going back to the author's purpose, and I can't stay there because when I look at Harper and Rowe, we define the purpose of the use as news reporting. In Campbell, we repeatedly referred to the use as its parody character. In Google, we talked about creating a new product that does something different. That's a fairly high level of generality, and that's the level we talked of. And so I don't know why the level that we talk about here is the actual use, which is what Section 1 tells us to do, of this piece of art. And we go back to Justice Kavanaugh's point. The specific use was of this one part of the Prince series, only one level of it, as a photograph in the life of Prince. Now, that use, you say on Factor 4, that it doesn't compete with the photograph, Goldsmith's photograph, but it's hard to see how not. They both sell photographs to magazines, and they both sell photographs to magazines to display Prince's vision or Prince's look. So I guess I go back to my point, which is, why isn't the higher level of generality what Section 1 is looking at? Your Honor, I don't think that that's what Section 1 is getting at, but I think Campbell makes that absolutely clear, because if it were the case that you had to look at the higher level of generality, in Campbell, what you would have said is, you have a Roy Orbison song, it's a work of popular music that's commenting on sexual attraction, and you have a Two Live Crew song, it's also a work of popular music, also commenting on sexual attraction, they would have the same purpose. But you didn't do that. Instead, you said, we need to look at the meaning or message, and then you analyzed whether the second work had a different meaning or message because it was commenting on the first. So you had to do that analysis, and I actually think Goldsmith's test actually requires you to do that analysis. They're not asking you to overturn the parody case law. What they're asking you to say is that the only meaning or message that can possibly ever count as a difference in meaning or message is when you have a parody. But I don't think that's true. I mean, I think that one thing that Campbell pointed out is that Two Live Crew couldn't have parodied or, and this would also apply to commenting on, this would also apply to critiquing maybe in the way that Warhol's Campbell Soup painting does, but that you needed the object. You didn't need, or Warhol didn't need Goldsmith's particular photo, right? I mean, it could have been a different photo. Well, what Goldsmith said below is that he did need the photo, and I think that's reflected in the district court opinion. But I think leaving, just stepping back from the question of need, I think that it's true that in parody, there might be an especially strong need to quote from the work that you're critiquing. But that's not, that doesn't mean that that's a requirement of transformative meaning or message. And as Your Honor pointed out, when Google invokes the soup cans, you know, if you're, if you're issuing a comment on consumerism, you don't need to use, you know, a copyrighted Campbell's Soup Can logo in order to make that comment. But you could use Cheerios. I mean, you'd have to use, I mean, it doesn't. You could find some. Yeah, it just doesn't have the same crunch. If it's generic. Well, okay. But I think with, but I think the soup cans example is especially helpful on that point, because it doesn't look for some sort of need or justification. You know, neither party sort of argued in the courts below didn't like assess a necessity test. I understand Goldsmith at this stage in the case to be introducing for the first time a kind of indispensability requirement, which has really no footing in any of the court's case law and really wouldn't make a lot of sense. Certainly the soup cans example, it was not like indispensable for Warhol to use the Campbell's Soup logo in order to create that image. And yet the court itself recognized that was a paradigmatic example of fair use. You said something in a minute ago about commenting on the original being a key feature. And I think that's true with this, the examples listed in the statutory texts as well, where they're commenting on the original. And I think the import of Campbell is that parity is a comment on the original in some respects, but how is a photograph used in an article about Prince commenting in any way on the original photograph? You might say that's the wrong way to look at it probably, but if that's what you're going to say, tell me why. Can I just answer your point about the text? Because I think that the text does not actually require commenting or criticizing the original. It just says comment or criticism. And so there's nothing textually that requires the comment actually to be the original. I think the better way to understand the text is if you look at Justice Blackmun's dissent in the Sony case, not a point that was, this point was not what he was dissenting on, but he was describing those different uses. And what he said is that they're all productive uses. And that was the term that was used at that time to talk about the sort of transformative uses that we're talking about. If you go to Campbell, the part of Campbell right before the part that you quoted says, the central purpose of this investigation is to see, in Justice Story's words, whether the new merely supersedes the objects of the original creation or instead add something new. Exactly. And so I think what supersedes is doing there is it's set up as a, it's juxtaposed as the opposite of what comes after the instead clause. And what the instead clause is new meaning or message. And so I think what it's recognizing is that the superseding that Justice Story is worried about is when you don't have a question. I asked about one of photographs used in a story about the subject of the photograph. How is that not superseding the object of the original photograph? So it's not because it has a transformative meaning or message. It would have sent a different message to have to use the Goldsmith photograph illustrating that Purple Fame article. The Purple Fame picture, the picture that accompanied that article was intended to, or did show its meaning. Its meaning or message was about the dehumanizing effects of celebrity as applied to prints. The Goldsmith photograph, as she herself said below, this is at JA 490, around 496, she was testifying as to what she was capturing was a photorealistic portrait of prints that showed him as fragile and vulnerable. There's no real dispute in this case that the real question in this case is whether that difference matters. And it has to matter both because of the text of 107, which talks about purpose and character. And does it matter though, how the new photograph, the Warhol photograph is used? It's used in a magazine article about prints. That would be one thing. It's used in a museum setting. That might be something very different because the Goldsmith photograph competes with the Warhol in the first. I think if you're talking about a particular use, absolutely, it would matter for factor four. I think it would also potentially matter as to factor one, but it wouldn't cancel out the fact that you would have to consider transformative meaning or message. I just want to emphasize though, and this is a very important point. This case really is not about just the licensing use. This case is about the creation. If you look at the request that her request for relief and our request for relief in the original complaints, this is a dispute over who owns the copyright to these works. She was asking for an injunction from us that would us not just from licensing the one 2016 work. She wanted an injunction that would prevent us from reproducing, displaying, selling, or licensing those works. The order that we won from the district court was an order that as a matter of law, summary judgment, fair use as to all 16 works. She didn't dispute that. In fact, she proposed the order that the district court ultimately issued. So this case is not just about the use, it's about the creation. And the reason that she wants to change the subject and make it only about the creation, about the licensing use, is because she realizes that if this case is about the creation of the works, then it would have dramatic spillover consequences, not just for the print series, but for all sorts of works of modern art that incorporate preexisting images and use preexisting images as raw material in generating completely new creative expression by follow-on artists. I wonder, Mr. Martinez, if your case doesn't benefit from a certain kind of hindsight. I mean, now we know who Andy Warhol was and what he was doing and what his works have been taken to mean. So it's easy to say that there's something importantly new in what he did with this image. But if you imagine Andy Warhol as a struggling young artist who we didn't know anything about, and then you look at these two images, you might be tempted to say something like, well, I don't get it. All he did was take somebody else's photograph and put some color into it. So it seems that it's harder than you say. I mean, we can't always count on the fact that Andy Warhol is Andy Warhol to know how to make this inquiry. Yeah, I think you're right in part, Justice Kagan, but I actually think that that sort of emphasizes the importance of this case. This case isn't just about Warhol. It's about the young and up-and-coming artists who want to be Warhol's successors. The artist's amicus brief, I think, says that the average salary or earnings for a young artist is less than $50,000 a year. Think about what it would be like for that artist who wants to create new and innovative work that integrates pre-existing images. If this court were to adopt Goldsmith's rule and say that that's not going to count, it's the fact that you're doing something completely new and different in terms of meaning or message, it makes no difference, that person is going to be dissuaded. They don't want to be tied up in litigation where they're going to have to pay attorney's fees. They don't want to have their hard work then nullified and their copyrights essentially taken over by people who created the original works. So this case is very important, not just for those artists. It's also important for museums, collectors, galleries who want to display these works. I see my time's expired. Thank you, counsel. Under your test, there are artists whose work consists of a single color within a frame, right? I'm sure you recognize those. I've heard, Your Honor. Yeah. And let's say somebody uses a different color. The original is blue and the allegedly copyright violation work is yellow. Sort of following up on Justice Alito's point, if you've got art critics to come in and say that blue sends a particular message, yellow sends a different one, would that satisfy any claim of copyright violation? Well, I think at the threshold, you'd have a question of whether that was infringement or not. I don't think anyone can copyright a color, but just assuming it was infringement, I think you would look at those. I mean, maybe you don't know, but I mean, are those paintings copyrighted or? I don't know the specific page, Your Honor. Sorry. But they're a frame with a color in them. I think if it was just the color, I don't think you can copyright a color. I do think, though, let's just assume that you made other changes and there was some sort of minor change. I think you would still do the four-factor analysis. I think at factor one, you would have to look whether there's, in fact, a new meaning or message. It sounds to me like under the hypothetical, there's no difference in meaning or message. And so I think it would be a loser under factor one. You and I might think there's no difference, but I'm sure there's art critics who will tell you there's a great difference between blue and yellow. And I think what a court would have to do if you're assessing whether those two works, again, assuming that there was infringement, assessing whether they had a different meaning or message, you'd have to listen to those critics. And we see experts on both sides of almost every case, right? And they don't always say the things that persuade the court. And you'd have to take them seriously to the extent that you would listen to their arguments, and then you'd judge whether it was reasonably perceived, whether their view of a transformed meaning or message is reasonable, whether it could reasonably be perceived. And I think that in a lot of these cases where you're really talking about a very minor change and someone's just a knockoff artist making a bogus claim to new meaning or message, I think that juries or fact finders can exercise their common sense and say that there's no transformative meaning or message there. Thank you. Justice Thomas? I assume that the orange prince is copyright. Yes. And I think that copyright's directly at issue in this case. Let's say that I'm both a Prince fan, which I was in the 80s. No longer. Well, only on Thursday night. But let's say that I'm also a Syracuse fan, and I decide to make one of those big blow-up posters of orange prints and change the colors a little bit around the edges and put go orange underneath. Would you sue me? Would the Warhol Foundation sue you if you were to do that? Well, you're their lawyer. I can't comment on whether we would sue you, but I think to try to get at your question, Your Honor, I think the question of whether that would be fair use. I mean, it sounds like you're by hypothesis asking me to consider that there's like a different meaning or message associated with the work. I don't think that's the only part of the inquiry. I think that everyone recognizes that at factor one, the ultimate goal here is to figure out whether the follow-on user is doing something sort of creative. I'm just waving it. I'm waving it during the game with a big prince's face on it. Go orange. Yeah. I think that in circumstances like that, it's very unlikely if it was just one of you. Oh, no, no. I'm not a marketer to all my Syracuse buddies. So I think in that case, the court would quite reasonably look at that and say that this is not the kind of productive creativity promoting use that is— In other words, you would sue me. No, I think that you would probably have a very weak case against me, Your Honor. But you've just changed position with Goldsmith. No, not at all, Your Honor. I think that in this kind of circumstance, I think this is totally different because there is a transformative meaning or message, and there's an enormous amount of— Well, I have go orange under it. I've changed the message. Right. But as I was saying, in addition to the difference in meaning or message, I think it's fair to consider at factor one whether the kind of transformation is the kind that the copyright laws are intended to foster, which is really encouraging follow-on artists to use creativity to kind of introduce new ideas into the public domain. I think that with all respect to your very accomplished re-rendering of prints, I think that what Warhol did here, as even Goldsmith conceived, was very substantially creative and absolutely is consistent with the goals of copyright law. Justice Alito? Very often, a popular song will be originally performed by one artist, and then other artists come along and perform it in a very different way. Presumably, they think that they are conveying a different meaning or message when they alter the way it's performed. Is it possible that any of them would not be infringing the original copyright? I think it would be very hard to imagine a circumstance in which they were not infringing ultimately under the full analysis. Why would that be? Well, I think it would be in part because of factor four, because I think that you would have—it would sound like if you have Roy Orbison does a version of Pretty Woman, and then another sort of Roy Orbison-style Pretty Woman emerges, I think it would directly compete with the original. So I think you'd have a very big factor four problem. I think under factor three, if you're taking an enormous percentage of the work, that would weigh against you as well. I think that, you know, would you get points on the board because of a transformative meaning or message? Maybe, but I don't think that in that kind of hypothetical that that would win the day. Justice O'Leary? I think my colleague, Justice Thomas, needs a lawyer, and I'm going to provide it. But I see the first and fourth factors as closely related, and I think he has a better case because he's not using it at the game for commercial purposes. But even if he were, it wouldn't be related to the picture. It would be related to the team. That's no different than that case involving what mayor was it? The Kainitz case? Yes, exactly, in which the T-shirts took his face and put something about his statement about a party on the T-shirt, and the court said that's okay because that was really a commentary on social issue, and it is commercial but in a different way. But what I don't having a problem with is, why doesn't the fourth factor just destroy your defense in this case? Meaning, you license directly to a magazine, which is exactly what the original creator does, and as Justice Kavanaugh said, it was licensing to the very topic that both do, which is two magazines that are talking about the life of not Warhol, but a prince. So, why isn't that direct competition? So, a couple comments on that. And for commercial purposes. First of all, just to reemphasize, it's not just the licensing use in this case, but just assuming we're just talking about the licensing use here. I think that Judge Kettle's analysis of factor four is essentially correct, and with respect to the Second Circuit, I think the Second Circuit's analysis of factor four was overly influenced by its impression that these were essentially, for all intents and purposes, the same work, because they were both portraits of prince. If we were going to rerun the factor four analysis, and if you wanted to look at it, I would just suggest you look at the briefing in the lower courts, because we obviously didn't do it here. I think the key things that I would suggest that would deserve attention would be, who is the audience for Warhol's licensing versus Goldsmith's licensing? I think there's substantial record of evidence showing that the audience is different in the people who would do the licensing, where Goldsmith's works were predominantly being targeted more to photorealistic, sort of like a Newsweek, or in most cases, like rock and roll magazines and other kinds of publications. I think you'd look at the price to see whether there were market substitutes. There you'd see that Warhol's works, even at the licensing as opposed to the purchase of the original works, were selling for a lot more. I think you would look at the aesthetics. The aesthetics are quite different. And I think you would look at the transformed meaning or message. All those things, I think, we think we would win for the reasons that the district court said. If you disagreed with us on that, I think maybe you would say, this is a fact issue that's got to go to a jury. But it certainly wouldn't be summary judgment as to factor four for Goldsmith. Justice Kagan? Justice Gorsuch? In 1984, did Vanity Fair need to pay Goldsmith? No, Your Honor. I don't think they needed to pay. But I think what this court recognized in Campbell is that if people offer to pay or do pay, that doesn't make a difference. I think in the Two Live Crew example, they, in fact, did try to get a license, even though, as the court recognized, it wasn't required. And then in your point about up-and-coming artists, obviously, that can be played both ways. And some of the amicus briefs, I just want you to comment on this. One of the amicus briefs says your position poses an existential threat to photographers. So I just want you to comment on that. We absolutely, strongly disagree with that. And why? Because we think that the kind of transformation that's important here is something that really adds, it creates a new original work in a fundamental way, not just because the work's in a different form or because it has different colors, because it has a different meaning or message. And I don't think in circumstances, especially if we are right on factor four, that there's either zero or not much impingement on her market, we don't think that that actually destroys anyone's livelihood. Rather, we think that promotes creativity in artists of all kinds. Thank you. Justice Barrett? Mr. Martinez, I think one of the problems that you have, as evidenced by a lot of the questions that you've been getting, is with the derivative works protection, which in 106-2 actually talks about transforming any other form in which a work may be recast, transformed, or adapted. And it seems to me like your test, this meaning or message test, risks stretching the concept of transformation so broadly that it kind of eviscerates factor one and puts all of the emphasis on factor four. I mean, when you've been asked about book to movie and songs, you keep flipping to factor four. So if a work is derivative, like Lord of the Rings, book to movie, is your answer just like, well, sure, that's a new meaning or message, it's transformative, so all that matters is four? I don't think that Lord of the Rings has a fundamentally different meaning or message, but I would probably have to learn more and read the books and see the movies to give you a definitive judgment on that. And I recognize reasonable people could probably disagree on that. I think that with respect to the derivative work issue, I think textually it's very important that in section 106, when it's talking about, sorry, in section 101, when it's defining derivative works, and later in the copyright statutes, when it's giving protection to derivative works, it says it's subject to section 107. And so just textually, we know that the fact that you're a derivative work doesn't mean fair use is out the window. So is there a tension between those two in some cases? I think probably there is some tension. And I think that what it means is that you need to do a very careful analysis of new meaning or message. And it's really going to be only in the cases that there really fundamentally is a new meaning or message that are going to be able to sort of satisfy that first factor. With respect to the balance between factor one and factor four, I think factor four plays a role when it comes to some of the very challenging hypotheticals that were put forward by Goldsmith and the government and by the court. I don't think it's really that big a deal in this case, though, because this case really involves a very fundamental transformation in meaning or message, and we think very little impingement on the market under factor four. Thank you. Justice Jackson? Yeah, so I've been trying to figure out, when you continually say transformational meaning and message, and you're focusing on meaning and message, it feels like it's doing a lot of work with respect to your factor one analysis. And I think, I think that it might be because you're conflating meaning or message with purpose. What I've heard you say a couple times is that the purpose of Warhol in this situation was to essentially convey a different meaning or message. That, you know, the original was in a more iconic way. But the statute, and I think this is something that Justice Sotomayor has sort of focused on, and to some extent Justice Thomas with this hypothetical, the statute seems to be looking at purpose in a different way. That it's saying the purpose is, are you using it for a commercial nature? Is it going in a magazine or is it going to a school? When you look at the actual text of the fair use factors, it's purpose and character of the use, including whether such use is of a commercial nature or for non-profit educational purposes. So I think you're actually treating purpose differently than in the statute. So can you? Sure. So I think we're definitely not conflating meaning or message with purpose. I think what we're saying is similar to, it's not quite conflating, but we think they're related. We think that one way to get to a different purpose is if you have a different meaning or message. Let me just give you an example. Say that you had a portrait of Abraham Lincoln, and Abraham Lincoln was depicted in a heroic way. And then you had another portrait that depicted him in a very negative way. I think that the purpose of both of those works would be fundamentally different. Absolutely not what the statute says about purpose. You just made my point exactly. There may be a different meaning or message, but if both of those depictions are going in a magazine for a commercial nature, the purpose, the reason why you've used it is the same. Well, let's just look at the moment of creation. At the moment of creation, they have different purposes, I think. One is to show Lincoln as a good guy. One is to show him as a bad guy. So what is the work of including whether such use is of a commercial nature or for non-profit educational purposes? I thought that was Congress telling us what kind of purpose it cared about. Right. I think Congress is saying that it says including, so it doesn't say that's the only factor, number one. And number two, as this court held in Campbell, the commercial use is not the main event and certainly not the only dispositive event. That was actually the exact issue in Campbell. No, but it's a type of purpose. Why are you doing this? Of course. You're saying, why am I doing this? Because I want to depict Abraham Lincoln in a heroic way. When Congress is saying, why are you doing this? Because I want to put this, you know, are you doing this because you want to sell it commercially? Are you doing it? But your honor, I think if that were the way to the right, the only level of generality to look at, we're not, I'm not denying, by the way, that I think you could look at purpose in that way. And that would also be a legitimate way of looking at it, of considering it. Well, I'm saying is that you can't exclude meaning or message. And I think the best case to show that is Campbell, because Campbell, again, you have two works of popular music that at your level of generality have the exact same purpose. We're entertaining people on the radio. You know, I've listened to them on Spotify yesterday. They have the same purpose. What's different between them is the difference. Why is that character? Why isn't the difference that you're pointing to character? And that's, that's something you factor in. I'm not excluding it. I'm just saying it's not purpose. We think it's both purpose and character. We think it's purpose because the meaning or message that someone is communicating is tied up with their purpose. If I give a speech that says, vote for Biden or vote for Obama or vote for Mitt Romney, I'm giving a speech, but the purpose in giving the speech is to convince people to that. One final question. If you, let's say you win on this point of the second circuit, made a mistake with respect to the way in which they treated meaning and message in the court vacates. Would you want us to go on and deal with the other factors? I don't think the other factors are briefed up in this court. And so I think, you know, there's some questions that have been raised about the other factors. I think it's reasonable to think that, that there might be some factual issues there that should go back probably maybe even back to the district court. It could even require a trial. We won a summary judgment on, on that, but if you thought differently or had concerns about Judge Kettle's treatment of the other factors, I think that would be the appropriate disposition. Thank you, Your Honor. Thank you, Counsel. Thank you. Ms. Blatt. Thank you, Mr. Chief Justice, and may it please the court. Fair use is an affirmative defense. It involves a multi-factor balancing test, and factor one focuses on purpose. What is the reason or justification to take another's copyrighted work? The reason can't be to avoid paying the customary price or the drudgery of coming up with something fresh. The copier has to explain why it needed, and not just why it was needed, to use someone else's expression. Here, Petitioner has never given any reason for copying Ms. Goldsmith's picture to commercially license Warhol's orange prints in 2016. Indeed, Warhol got the picture only in 1984 because Ms. Goldsmith was paid and credited. Petitioner responds Warhol is a creative genius who imbued other people's art with his own for music. Those giants still needed licenses. Even Warhol followed the rules. When he did not take a picture himself, he paid the photographer. His foundation just failed to do so here. Petitioner argues adding new meaning is a good enough reason to copy for free. But that test would decimate the art of photography by destroying the incentive to create the art in the first place. And it's obvious why the multi-billion-dollar of movies, music, and publishing are horrified. Petitioner's colloquial definition of the word transformative is too easy to manipulate. The act also gives creators and not copiers the right to make derivative works that transform the original into new ones with new meaning. If Petitioner's test prevails, copyrights will be at the mercy of copycats. Anyone could turn Darth Vader into a hero or spinoff on the family into the Jeffersons without paying the creators a dime. I welcome your questions. Ms. Blatt, you in your brief and then even in your opening statement, you focus on purpose in 107. You did not mention character in your opening statement and you don't give it a primary role in your briefs. What role does it play in your analysis? Character, I mean, I think we agree with their definition. The character of the use of the copying is one of commercial licensing and the purpose. I mean, I think that they are very similar here. The purpose and character of commercial licensing, the purpose and character of a parody, I guess, is very similar. So I'm not sure that they ever play and haven't seen them play a distinct role in any of the case law or in the common law for that matter. But how can you inquire into purpose and character without thinking about meaning or message? You know, what the first factor is really asking you to do is to say, what is this use doing? And how can you answer that question without thinking about the use of meaning, the message? We absolutely think meaning and message is relevant as it relates to purpose. So that is different from what the Second Circuit said because I thought the Second Circuit took it out of the analysis entirely, said it was irrelevant to the question. No, and I think that's very unfair to three members of Article Three who three times said meaning and message is relevant. Three times. Yes. Well, I find it insulting to the Second Circuit panel when they said, do not assume the role of art critic and by this notion of, well, Prince is shy here and he's iconic there. But of course, meaning and message is relevant as to purpose. I mean, I can just keep reading you quotes, but you know how to read a decision as best as I do. But on the very same page they're yakking about, it says it has to be reasonably perceived as having a distinctive artistic purpose, one that conveys a new meaning. It's just saying what you can't have and what we're all unified on, the government, us, and all of our amici, is you cannot have a bare purpose to add new meaning to someone else's art for profit. And if that's all he has, he has nothing else. He has no justification for this other than I wanted to take someone else's art and put my own distinctive style on. And one expert thought that Prince looked happy or dead or, I don't know, larger than life. And one thought he looked, the artist here thought Prince looked real. And so that is all the Second Circuit had was they had a district court opinion that went completely, this is a war hall and, oh my God, it's a war hall. So it's transformative by definition. And the Second Circuit said, no, no, we're not going to do that here. You're going to have to give me something more than this is a war hall with a distinctive style. And where do you get the idea that you have to need the original work? So where we get the need is from the five times in Campbell that the court said it. But it's, so Campbell doesn't say that. Campbell says, well, if you need the original work, that's the paradigmatic case. But it doesn't say that if you don't need the original work, the first, it can't be transformative. So, yeah, let me just state our test. When the defendant has an asserted purpose for copying someone else's work, you ask, was there, was the copying of the original needed to best achieve the defendant's, I'm sorry, yeah, the copier's purpose. Now in Campbell, it is very significant that they are misciting and quoting Campbell. The court did not hold it could be reasonably perceived as having a new meaning. The court actually held it could be reasonably perceived as criticizing or commenting on the original. And without that necessary element in the court, five times said it was critical. It was critical. It was the heart. And without the need to mimic, you have no claim to the victim's imagination. And while we know that new meaning could not have been the Campbell starts with a statement of things being new and different and encouraging creativity to give new and different things the kind of fair use pass. And then Google follows up on that. And it doesn't talk about in your language at all. And it uses Warhol as an example of how somebody can take an original work and make it be something entirely different. And that that's exactly what the fair use doctrine wants to protect. So, you know, I take it that Campbell has some language that cuts you away in the sense of saying, well, if you are commenting on the original, that's real fair use protection. We almost don't need to go any further. But if you're not commenting on the original, there's still the possibility under Campbell and then certainly under Google that, yes, this is fair use because it's the kind of thing we think of as truly transformative. So I would say you should look at a holding over a dicta that uses a non-statutory word transformative when the actual word transformation is in the statute. The dicta that they're relying on is saying, we think, that when you have a parodic purpose and a parody in the process of shedding light, which I'm just quoting your word, shedding light on the original, you benefit society and create new meaning. But why you know and why all that matters in this case is they had an affirmative defense and they just didn't give you a good reason for copying. And why you know that Campbell completely rules that out is what mattered in Campbell was exclusively the parodic purpose. If new meaning and message were relevant, the court would have been spending the whole time talking about the pretty woman you wanted to meet on the street versus all those not so pretty women you didn't want to meet on the street that were hairy, bald, two-timing Mr. Mix, and one was pregnant and wasn't sure whose friend it was. No one was talking about the women's personalities in Campbell. It was trying to criticize. No one was talking about the personalities of George Washington in Folsom versus Marsh. It was just, is this a biography about Washington? And no, that's two, that's the same. Ms. Latt, you said that the only thing that's different was the distinctive style of Warhol. I think your friend's point is broader than that. It's not just that Warhol has a different style. It's that unlike Goldsmith's photograph, Warhol sends a message about the depersonalization of modern culture and celebrity status and the iconic, and it goes through the different features to support that. So it's not just a different style. It's a different purpose. One is the commentary on modern society. The other is to show what Prince looks like. Yes, I think that's right. And when I say distinctive style, his distinctive style by celebrity and dehumanizing him, and we're saying that that level of what is the personality, what do we perceive in Prince's face, or what we think about when we think about what the author intended would just drive a giant hole through a derivative work, which by definition is a work that adds new meaning to the original. And anytime, I know he wanted to stick to book versus movies, but any spinoff, any adaptation is, it just starts with a new meaning. Take All in the Family right now. He had more spinoffs than any show in American history. The Jeffersons was about a prospering African-American family who lived on the east side. All in the Family was about a white bigoted living in Queens who couldn't keep up with society. They both were television shows, right? And they were portraying a particular socioeconomic whatever element. This is a whole different thing. The one is a picture. You want it there to show what Prince looks like. So it's a I'm sure composed in a particular way and all that. The other, you're not looking at it. The message you have, if you put them side by side, the message is not the same. The one is Prince's hair is like this, his expression is like that. The other one's entirely different. That's why they put the black around one eye. That's why it's just the disembodied face, all of that. And you don't say, oh, here are two pictures of Prince. You say, that's a picture of Prince, and this is a work of art sending a message about modern society. And that just would turn Folsom versus Marsh on its head, which was they had a completely imaginized autobiography of George Washington, the first president, and all that mattered to just the story was that they were depicting both works for depicting the life of George Washington. Your test lies madness in the way of almost every photograph to a silk screen or a lithograph or any editing. I guarantee the airbrush pictures of me look better than the real pictures of me, and they have a very different meaning and message to me. Well, I think that's not right. I mean, I think you would look at, I think you would look at both of them, and one would say, those are pictures of the same woman. This one may look a little better than that one, but it's the same woman. It's for the same purpose. It's to show what she looks like. But if you had a picture, a photograph of you, and then Warhol, you know, it's just not the same thing. You look at the Warhol thing, and you say, oh, that's, you know, that's, the problem with this line of theory is you're just putting photography in its own category and saying photography can just be ripped to shreds, because you can always edit a picture and make these arguments, black and white versus color, etc. But once you move to any other type of medium, books, movies, and songs, these giants, there are giants in all these creative fields who, by very, for the virtue of the fact that they took someone else's work and transformed it into shows that are way more valuable. If I could just talk about Factor 4, because his answer was just astonishing, that the first half of his argument was solve everything under Factor 4. The last half of his argument is, we win in this case under Factor 4 because of a trial at a different market. And imagine my Jefferson's hypothetical. Everything he said about Warhol versus a goldsmith is the same article you could have said about the audiences that want to watch, or Mork and Mindy versus Happy Days. That is one character from Happy Days involving some Martian who came in, and Robin Williams was so funny that a whole new show was created called Mork and Mindy. They had nothing to do with one another, different audiences, and under his view, just everything he said about Factor 4, you'd have a trial of every single case, and he just basically forces all authors to go into Factor 4 with one hand tied behind their back where there's already a finding that this is a transformative work. Miss Goldsmith lost under summary judgment under Factor 4 because the district court said, hey, you have a transformative Warhol, and it is inconceivable that somebody would want a shy-looking prince over the same prince. Miss Blatt, what do you think the Second Circuit meant when it yacked about art critics, that judges not being art critics? Was the point that a judge is supposed to determine whether a person who knows nothing about either of the works of art is supposed to determine whether they seem different? You can't have testimony, evidence about the meaning of those things? So the district court, I mean, sorry, the Second Circuit had left open a very large amount of type of fair use that I think, or sorry, transformative purpose that we would not think is correct, where I think in their view, you can look at it objectively. What the district court, sorry, the Second Circuit was saying about don't assume the role of art critic was the notion that you would have such a level of specificity as to the vibe that the character being depicted was giving off, just like the notion of, you know, we could talk about all kinds of movies and adaptations. Was the character in Jaws, the book, different than the way the sheriff was depicted in the movie? And we could give, The Shining is the best example. We know Stephen King had a very Cooper did to it. He said, I don't like your Jack. I'm going to do my Jack, who's a horror film. Suppose that the Mona Lisa was copyrighted, and somebody really skillful copyist made almost an exact copy. Most people could never detect the difference, except the copyist changed the color of her dress. If you show those two to most people today, they would say, well, all right, brown dress, blue dress, red dress doesn't make any difference, right? That's not really important. But if you called somebody who knows something about Renaissance art, the person would say that makes a big difference. If that's a blue dress, that's sending a message. If it's a red dress, that's sending a different message. So what I think all this goes wrong is you're just focusing on meaning and message independent of the underlying use. In this case, the statute, just by its terms, is talking about use. And in the case of the Condé Nast, the use is to portray prints. If you reprint our pictures, whether it's Miss Goldsmith's or Andy Warhol's, you're commenting on the pictures. I don't think you're saying anything about prints. Your use of those pictures is to describe and discuss the case, same way with the briefs and news articles. These are news reporting or any kind of commentary about the pictures. And in your Mona Lisa example, fair use never, I mean, nobody sues an artist or sued Two Life Crew when they were in the recording studio. You have to look at the actual use. And in Campbell, the court said, in a parody, fine, we'll give you, we'll spot you that, but we'll send it back for a trial under Factor 4. But if you're going to start using it for advertising, that doesn't count as an appropriate use under Factor 1. The same thing was true in Sony. It wasn't the recording that the court was focused on, it was the time shifting. When you watch it at home, not for money, not for profit, that's the only way you're going to be able to see the show that the networks were offering. What about the use in the museum, Warhol hanging in the museum versus the use in Condé Nast? Is there any difference? Absolutely, for a variety of reasons. The first is Factor 4. And we have the largest museum in the world sitting next to me on my right, who's on my right and not one on my left. Factor 4 is just different. Goldsmith doesn't compete in that market. On Warhol, if I can just take you away from prints, and also now that this print series is famous, I don't see how any museum can't display these. But the print series is very complicated because of the license. But if their poster child for museums is Andy Warhol, let them tell you what Andy Warhol is worried about. He took all the pictures of the famous ones or he got a license. Marilyn, who's I think worth a lot of money now, that picture is in the public domain. That guy didn't renew the copyright, Gene Corman, before he died and the copyright law was passed. So I don't know what they're worried about. If you look at the pictures in the museum brief, it's a bunch of naked women. And no one is trying to say that naked women are going to be taken down from museums. There was nothing. I just the pop art. Maybe there's a different point about museums. And the point is, why do museums show Andy Warhol? They show Andy Warhol because he was a transformative artist because he took a bunch of photographs and he made them mean something completely different. And people look at Elvis and people look at Marilyn Monroe or Elizabeth Taylor and Prince and they say, this has an entirely different message from the thing that started it all off. And that's why he's hanging up on those museums. And that's why whatever the Section 4, the Factor 4 inquiry might be, that's why it's hard to look at it and not say under Factor 1, that's transformation. Well, in our view that I mean, I think the government might have a different view under museums, but everyone agrees that in museums, there's going to be fair use. And there's also particular provisions, mainly 109, that both our brief and the government's brief talk about that separates for display for museum purposes. But where I think I disagree with you is just that the display in a museum of prints is still copying and still using Ms. Goldsmith in a way that doesn't justify the copying of Ms. Goldsmith. Now, she doesn't have market harm, still fair use, she can't sue. All remedies as to museums and to possession and sale were waived here in the complaint. He read the complaint accurately, but it was all expressly disclaimed. And so all we have here is the commercial licensing. But you also have a disclaimer, both in the Second Circuit and the Supreme Court, that Warhol doesn't have a claim for, I'm sorry, that Ms. Goldsmith doesn't have a claim for museums. Excuse me, do you have a claim for the original print series? The original painting? So the possession and physical, it turns on the license, because remember Warhol, there was, these were produced under a license. And so it's unclear whether all 16 were made pursuant to that license or made as drafts. And if Warhol wants to, and the Warhol Foundation doesn't even own any of these. So the possession and sale is not, wouldn't be with respect to them. But assuming that they were all lawfully created, they can be, then this turns under 109A, which says you can, you can sell the possession. What's not protected is just the commercial licensing. Justice, Judge Jacobs below said he didn't think that the Second Circuit's decision or injunctive relief encumbered the original print series, I'm quoting him, I think, or anything that was hanging in museums and things. Do you read, what's at issue here? What use is at issue? Is it the commercial licensing? And I think 46A. What commercial licensing? Of orange prints in 2016, plus the request for injunctive relief for other similar commercial editorial licensing. So in for magazine usages. Can we go back to you? Thank you. Thank you, Counsel. Justice Thomas. Justice Alito. Justice Jackson. Yes, thank you. Can we go back to the necessary condition? Because I'm still not quite understanding it. First, I thought there was something in the legislative history that I may have read about Congress considering a necessary condition and taking it out. Does that sound familiar to you? No. No. Okay. I mean, it's not there. The legislative history, though, is very helpful because it's got, I highly recommend the Monell, Balganesh, Jane Ginsburg brief, because it gives you all of the complete history and background. And they would read it a little beyond relation back where it's necessary to copy. But it basically is limited to these very core usage uses. What about what about commentary? That's what I'm worried about, right? That parity, I understand you would say it's necessary. And so that would fall into your fair use test. But something like the Campbell's Soup can where we've already established, perhaps he could have used some other item to make the same kind of comment. Would that not be necessary? I think that Campbell's Soup fits in two places. And Justice Kennedy's concurrence and Campbell is really good on this point. What Justice Kennedy is saying is that the writer can always pick his target. You can always pick what book review you want to critique or what song you want to parody. So you never you have to say, well, you didn't necessarily have to pick on my song. So Warhol was entitled to comment on Campbell's Soup as a form of talking about consumerism and make whatever broader point he wanted to make about society. But the Campbell's Soup label, and not only is it a completely different purpose, because one's an advertising logo that goes on a supermarket shelf to a work of art. But, and I think the government's brief says this, he can't have used a generic soup can. He had to use the Campbell's Soup logo. The same as if he had picked Cheerios. It would have been really weird to do. I guess back then they didn't have the giant Cheerios. But you've got to use Cheerios to make your point about consumerism and brand loyalty. It's still necessary. Absolutely necessary. Some branded product. And what the government would say, and obviously the government can speak for herself, but they would say at least useful and we're okay with that. We're actually okay with anything other than the new meaning or message test. But you're, so, so you're, the second circuit looked at this a certain way. And are you saying they, they did it wrong? No, they did it absolutely correct because they were just rejecting the district court and saying, we're leaving open everything. But something that says Prince looked iconic versus Prince looked shy based on these interpretations of what one might reasonably think of Prince's, I don't know, mood or something or personality. But I read the second circuit is way broad saying you don't have to comment. I mean, I think they leave open all kinds of stuff like collages. Like if you took a picture of Prince and made him into a, like Goldsmith's Prince and made him into a big butterfly, I think they would say that's completely fair use. So I think for your purposes and which is what's driving all the, you know, the amici being kind of very upset here is just to reject a new meaning or message test where it's just a bare unadorned new meaning or message test. It's not tied to any purpose other than I want to make some money off some art and I had some really cool idea here. Thank you. Thank you, counsel. Ms. Dubin. Mr. Chief Justice, and may it please the court. Two questions drive factor one. Does the use serve a distinct purpose or instead supersede the original? And what is the justification for copying? Both point against fair use here. The foundation has never tried to show that copying the Goldsmith's photograph's creative elements was essential to accomplish a distinct purpose. And the foundation commercially licensed Warhol's Prince to serve the same purpose as the original, depicting Prince in an article about Prince. Using another artist's work as a starting point to turn around and compete directly with their original has never been considered fair. The foundation suggests otherwise only by urging you to look primarily to what the silkscreens mean rather than why the copying was justified. The courts reject that test. In Misery's Campbell, it requires courts to inquire into the meaning of art and it would destabilize longstanding industry licensing practices that promote the creation of original works. Sequels, spin-offs, adaptations all become fair game as conveying a different meaning confers license to copy. I welcome the court's questions. Counsel, in what way is the government's position different from that of respondents? We agree with respondent that the most straightforward way to establish fair use under the first factor is if your work is, if your use is commenting on the original, criticizing it or otherwise shedding light on the original. But fair use is an affirmative defense and we would leave open to defendants in various cases to establish that their copying was justified for other reasons. The problem with petitioner's approach here is that they haven't tried to establish that the copying was justified, just that the meaning of the works is different and the court has never recognized that to be a sufficient justification under the first factor. You agree, don't you, that the Warhol work is not a commentary on the Goldsmith photograph, right? We would agree and they've never argued that. And Goldsmith had a very different purpose than Warhol. She was photographing prints. This is what he looks like. Now, a lot goes into that composition. But it's not that Warhol's work was just a different composition, was it? We think that the relevant question is what is the use at issue here and the use at issue here is to depict prints in an article about prints, which is very similar to the purpose at issue. But if you really wanted to know what prints looks like, you wouldn't get that from Warhol's depiction. He doesn't have one eye that's blacker than the other. His head doesn't float in the air as it does in Warhol's but not in Goldsmith's. And that's because, I think your friend on the other side would say, it's because the purpose of that picture is not to show you what prints looks like. It's supposed to show you a particular perspective on the pop era and celebrity status. No? Those changes that your honor is discussing are the same sorts of changes that really accompany the adaptation or transformation of any derivative work. You can imagine all of those comments being made about a book being transformed into a movie. Those are comments about a change in style, a change in aesthetic appearance, and things of those nature. That has never been thought sufficient under the first factor to be a different purpose. What about character? Is that sufficient for character? You talk about them together, and so is character doing different work at all in this analysis? The court has long considered them together as a unit and then done an inquiry into purpose and character together. We think that if you were inclined to do so, you could look at character as focusing more on the commercial nature of the works of the use at issue and the purpose as what was the justification for copying. Either way, you would come to the same analysis here, which is that this is a highly commercial use that usurps the market for the original and that the justification for copying isn't present. But the meaning of message, you say, is not indicative of character. That's not our position. The position is that meaning of message can be relevant insofar as it assists the court in determining what is the purpose and character. I think that's exactly what the court looked at in Campbell. In Campbell, the court looked at the meaning or message of the two-line croissant to determine if it was in fact a parody and therefore had the purpose and character that we're looking for under factor one. The purpose of all copyright law is to foster creativity. So why shouldn't we ask at factor one, not in a determinative way, there's factors two, three, and four, but in factor one, well, is this really creative? Is this thing we have here something new and entirely different? I think it seems to fit right into why we're having this inquiry in the first place. The purpose of the copyright law are to serve as the engine of free expression, but the balance that Congress struck in achieving that is to say we do that best by protecting the rights of original creators and protecting incentive to create without safety. Except when we don't. I mean, we protect original creators, except when we don't. And the purpose of the entire thing is to foster creativity. So why shouldn't we ask whether at the follow-on level, there really is creativity here. And then we can ask a whole bunch of other questions about markets and so forth. But to take that out of the analysis, to say it doesn't matter that the follow-on work is adding something of real significance to artistic expression. Why would we do that? I think the most significant difficulty with petitioner's approach is not, we're not trying to take it out of the occasion. It's not about putting points on the board. It's whether it goes to the purpose and character of the use. And I think maybe this helps with what your honor is driving at. In the statute, there is a specific right given to the copyright holder to derivative work, to prepare derivative work. And that Congress thought about this question and gave that right to the original copyright holder. Someone who wants to make a very, very creative work can go and license that work to use it, or they can justify why they needed to take this work or why it was essential or highly useful to take this work in order to create the work. But what's going on here is you have someone who's just saying, my second work was very creative. My second work was transformative in the colloquial sense. And that doesn't fit within the definition of derivative works versus safety vows or fair use. Can I just paraphrase what I thought I heard you say? Because I'm not an expert in this area. So the whole of copyright law itself in this area is to give the person who has the copyright the right to make other uses of the thing. It's sort of like a property interest in, I get to, I, because I hold the copyright, get to make other uses. So when someone else makes another use of your thing, you then can question, you then say, why are you using my thing to do your work? And I think your argument is, if that person says, I'm using your work because I have a better idea or because I want to add a little thing to it or that's not going to be good enough. They have to say, I'm using your work for some other purpose that's outside of or in addition to, I want to add a new meaning. Am I, at a very high level of generality, did I sort of get what your point is? I think you got it exactly right, Justice Jackson. That is our point. The point is that you have to justify the copying, not just explain why your work is a creative addition to the world of licensing. And it's important because of sort of how the licensing regimes work across industries where there are many, many very, very creative people who are producing derivative works, whether it's the one that Respondents Council already addressed, but it's Spielberg, it's Scorsese. It is so many people who do tremendous creative additions to the work that they're using, but because they don't have the sort of justification for copying, they need to get a license. How do we fit your answer to the following scenarios? Okay. Do you acknowledge that a commercial licensing would be fair, such as an authorized reproduction of orange prints in an art magazine or in a book about Warhol? We would analyze that by running through the four fair use factors. And I think in that- How would you deal with the first one? Because it is a commercial use. It's use of a painting that you say is a derivative work. So how do we explain that? Right. I think factor one and factor four might play out differently than here. Factor one, you might say the purpose is to say something about Warhol, to teach about Warhol. And under factor four, you might say that it's very unlikely that that would harm the market for the goldsmith photograph because her photograph could not be used for that sort of occasion. So how about the commercial license for orange prints? Like happened here, why do you say it doesn't fit for a magazine about Prince's life? Because the purpose of the goldsmith photograph is to depict Prince. And while there might be differences in how she did it and how Warhol did it, they were both being used in this when you compare the two, the work and the use, they're both being used for the purpose of depicting Prince. Let's go back to Vanity Fair, which was paid for, but assume it wasn't. Okay. But that Vanity Fair was an article about Prince, but its focus was on his superstar status, his consumer sort of life. It seems as if those purposes coexisted, not coexisted, but were joined at the hip with using a Warhol because Warhol was known for making commentary on the very same issues. So why would they have needed a license back then? I think the key to thinking about this case is what is the justification for borrowing? Why did you need to take the creative elements of the goldsmith photograph? So to produce the Warhol version of Prince, Warhol could have taken a photograph of Prince himself. He could have used other photographs. He didn't need to reproduce the creative elements of the goldsmith photograph to have that effect. Well, what if Prince would not have sat for a photo by somebody sent by Warhol, and Andy Warhol wanted to comment on Prince, and what he needed was a full face portrait looking straight ahead. I don't know how many of those were available, but he had to take one of those, so he chose this one. Wouldn't it be highly necessary for him to take one of those photos to do what he wanted to do? You might have a different argument in a case where someone has passed away and there's only one version of the photograph that you could possibly use. That might be a different case, and you might be able to establish justification for borrowing. Like I said, we don't want to foreclose additional justifications working, but this is a very different case. What happened here is that Vanity Fair, because they had a license, picked this photograph and gave it to Andy Warhol so that he could produce an image of it. That's the opposite of having a justification for borrowing. I wanted to start here because it works to reproduce that as a photographic negative. Is that dependent on the fact that he could have picked another photo? Do we know that there were other photos that met the criteria that I mentioned? There were other full face photographs of Prince. I think they're in Petitioner's Brief. I also think very much in Andy Warhol's life after the 1960s when he was sued for copyright infringement, he often took photos of the people he was going to paint. It was Dolly Parton, Jane Fonda, and many other celebrities. I have a question about the derivatives. When I asked your friend on the other side about derivative use and the tension between the transformation point here, and you also pointed to the language that I asked Mr. Martinez about the transformative in the derivative use provision, he responded to me, well, sure, but that's also subject to the Fair Use Statute, so they have to be read in tandem. What's your response to his point? We think they have to be read in tandem, although the word transform is in the provision for derivative works and it is not in the fair use factors. It was, I think, a shorthand for the purpose and character inquiry drawn from Judge Lovell's articles, which all look to transformative purpose, not transformative content, which is, I take it, how they are framing the case. I do think that if you are sort of thinking about how to balance those rights and carve out space, you would never want a reading of the fair use safety valve that totally eviscerates the derivative work rights, and that's what we're particularly concerned about with Petitioner's test here, because so many derivative works can be described as conveying new meanings or messages. You said in your opening that the position of Petitioner would destabilize long-standing industry practices, so can you flesh that out, why you think that? Yes, and that follows up right up to what I was just saying to to original artists to create, particularly in spaces where the original work maybe doesn't have the same commercial viability as derivative. Incentive is the licensing of derivatives, so whether that's photographers, books who are hoping that a movie takes their book, things of that nature. All of those, I think, would be subject to a different meaning or message analysis like Petitioner proposes here, and so it's whether, I think, just as Kagan said earlier, the plot is changed, the storyline is altered, new characters are added. It seems to me it's very hard to distinguish those from what's going on here, which is suggesting that a change in a particular phase from vulnerable to iconic is enough to justify fair use under the first factor. And, you know, Petitioner has said today that it's really more about putting points on the board, but the way that I understood their test is that they said that that sort of meaning or message renders fair use presumptive, and that's in their brief at 40, and I think that's the particular danger of an approach like that, is how much is meaning or message could tilt the message, and how hard it would be to disprove. So if we agree with you that the first, about the mistakes, or affirm on the grounds of the first factor, why wouldn't we just vacate and send it back and let the Second Circuit go ahead and do all the other aspects of the analysis? You ask us to affirm, and I'm just wondering, since it wasn't briefed, two, three, four, why wouldn't we send it back? If you agree with us? Yes. Are you asking to affirm? Yes. Yes. And my question is, why are you asking to affirm the entirety of the Second Circuit's analysis in this case, as opposed to sending it back and let the rest operate? Is that not what's happening here? The Second Circuit ruled on the second, third, and fourth factors and did so correctly, so there's no reason I don't... But that part is not briefed. I mean, we haven't gone through the second. Is the second, third, and fourth factors briefed before us now? Petitioner only sought certiorari on the first factor, so I think if you were going to reverse or vacate, you would do so on the first factor, but I think it is well within the Court's purview to affirm based on agreeing with either how we have approached fair use under the first factor, or with agreeing with the Second Circuit and then affirming on the rest of the Second Circuit. But would we go through the rest of the analysis? We wouldn't talk about it? We would just affirm and move on? I think that would be what you would do if you were limiting yourself to the way that petitioner has framed this case. If there were things at the point that the Court wanted to clarify to help the lower courts in this difficult area on a case-by-case basis, in the second through fourth factors, the Court could certainly do that. Can I ask the question slightly differently, which is, let's assume we adapt petitioner's first argument, the argument first raised here, because he seemed to be saying in his brief that meaning trumps everything else, but here he says it is only one variable. Let's assume that we were to find that the Second Circuit should have given more weight to meaning, and so that the first factor is at either an equal pose or slightly favors him, or whatever, or favors him a lot. Why would we affirm and not vacate and remit? So we think that the Second Circuit did consider meaning or message. We agree with respondent. They do mention that they considered meaning or message several times in their analysis, but if the Court found that they didn't weigh it heavily enough, or you agree with the position being put forth by petitioner today, then I think the right answer would be to vacate and have the Court run the analysis with that change on Factor I. Thank you, Counsel. Justice Thomas? Justice Alito? Justice Sotomayor? Anything further? Justice Kagan? Justice Gorsuch? I am a little uncertain about the government's position on what it means in Factor I. The purpose of the use could mean, as we've discussed, they're both being used for identifying an individual in a magazine. Okay. Or it could mean the purpose of the use could have something to do with the artistic message being conveyed. I've heard bits of both flavors from both sides in this case. And certainly the Second Circuit thought that the latter idea, that there's some artistic message that's relevant at Step 1, is part of the analysis. And what is the government's position? I could see possibly saying, oh, no, it's only that it's being used for commercial purposes in a magazine. It's the same use of the image, and that any differences between the images is something that we take account of maybe in Factor III, which has to do with the amount and substantiality of the portion used. Can you help clarify that for me? Yes. We think it's principally the purpose and character of the use. It's a broad inquiry, and we're not trying to carve out certain justifications from not being made. But what you are looking at is whether you have a purpose along the lines that is distinct, right? It's distinct from the original purpose, and that the use at issue, it was essential for you to copy from the underlying work to accomplish that purpose. And I think that the court... I'm going to stop you. I'm sorry, but that isn't helpful for me. Okay? And maybe I'm being too dramatic in the difference between the two. But I do see the way to read, number one, the first factor in two very different ways. The purpose of the use could be the purpose of this particular use in a commercial setting, right? Because it does go on and talk about commercial versus noncommercial. And here we would say they're both being used in magazine covers to identify an individual. Okay. Done. Or one could say, ah, but Andy Warhol had all sorts of different subjective meanings, and a reasonable viewer could take away different meanings from them. Is that second thing relevant at all at the first step in the government's view? And I kind of like a yes or a no if I can get one out of you. Can I say yes to part of your question and explain why? Is that okay? You can do whatever you want. I was just hoping for a yes or no. Well, the reason that I would like to do that is because you asked about his subjective intent, and you also asked about the reasonable perception of the audience. So I don't think the subjective intent is relevant. So that's a no to that part of the question. But to the audience's perception, I think it can be relevant, and here's how. I think Campbell's soup can is a very good example of this. In Campbell's soup cans, the effect on the viewer, the effect on the audience, depended on the incorporation of a very well-known commercial advertising logo. It wouldn't have worked if you had— Well, let me stop you there, and I'm sorry to interrupt again, but see, Campbell's soup seems to be an easy case, because the purpose of the use for Andy Warhol was not to sell tomato soup in the supermarket. It was to induce a reaction from a viewer in a museum or in other settings. And the difficulty of this case is that this particular image is being used, arguably, maybe, for the same purpose, to identify an individual in a magazine, okay, in a commercial setting. So the Campbell's soup one seems to be a very different case, and this is a much harder case. So back to my question. So I completely agree with you on the purpose of the use being very different in the Campbell's soup can analysis, which makes it an easier case. But I was also using the Campbell's soup cans as an example of why the effect on the audience would matter. And the effect of the audience in the Campbell's soup can case, it would matter that you incorporated from a pre-existing commercial advertising logo, as opposed to made your own logo, made up a logo. Whereas here, if he had taken his own photograph of Prince, that wasn't necessary for the effect, which is a very different type of analysis. I hope I answered your question. You did a great job. Thank you. Yes, Justine. Can I just ask you about that? Because you said it wasn't necessary. But I thought that one of the differences between these two briefs was that Ms. Blatt says it has to be necessary, and that the government says, well, necessary is a significant part of the question, but even if it's not necessary, it can satisfy factor one. You're exactly right. That is a difference between us. I think that, and the answer in the Campbell's soup can analysis is probably that it's not necessary that you needed to use the Campbell's soup can, but that could, maybe you could have used Cheerios, but that it was highly useful to use that type of advertising logo. I think the best example of those distinctions is in a book review, where it's not necessary to incorporate the underlying book. You can certainly imagine publishing the book review without incorporating some excerpts from the underlying work, but then you'd be telling the reader things as opposed to showing them. So, it makes that far more effective to the audience. Justice Scalia? So, the exact words we use on that question, in the opinion, if we were to agree with your side, will undoubtedly be the subject of a lot of debate. So, I want to get it exactly right. So, what are you advocating? I've heard you say necessary, essential, or highly useful. Is that the formulation? We would say that's a great formulation, or you could say necessary, or at least useful, or you could say just essential, and I think that covers it. But I think the best way to explain those are going to be very different in some courts of appeals. So, what's your best answer as to what the best formulation is from the perspective of the United States for the opinion, if your side wins? If you're going for the straightforward clarity of a one-word answer, I would say essential. The reason we use... No, you can use multiple words. What's the formulation? The reason we said necessary, or at least useful, and the reason we used that formulation was because in a lot of cases, and a lot of the most straightforward fair cases, it will be necessary, and I think that's why I respond and have used that word. We think that there are cases in which it is essential or highly useful, and those should also count. So, necessary and essential were synonyms. So, if you say necessary and you say essential, that to me means the same thing, which is something different from useful or even highly useful. We think that highly useful works too, and like I said, I think the reason that a highly useful test would work is in the book review context that I gave your honor earlier, which it's not necessary, and I think in a lot of examples, that's the case. I think using the word necessary does lead to more straightforward results in the minor enough cases. Okay. I'm going to really pin you down again on that. Necessary or highly useful, or necessary or at least useful? We would say necessary or at least useful, and the important thing is that it's an affirmative defense. So, the defendant in the case is giving a justification for why their barring is necessary. What really separates us from Petitioner is not necessary versus useful or essential, it's that we think you need that justification for borrowing, right? We think you need some reason why it was essential for you to incorporate the preexisting work. I think the best formulation given your considerations here is necessary or at least useful. That's how I would phrase it, for your opinion. Very helpful. Thank you. Justice Barrett? He would leave out essential? I was deferring to Justice Kagan, if he's necessary and essential as synonyms, but I think that essential would work as well. Okay. Thank you. Justice Jackson? Can I just clarify essential to incorporate the existing work in order to what? In order to achieve a purpose that's different than I just have a better idea, right? In order to achieve a purpose that transcends a changed message or meaning, right? That's exactly right. In order to achieve a distinct purpose. A distinct purpose. Yes, that's exactly right. Thank you, counsel. Rebuttal, Mr. Martinez? Thank you, Your Honor. I want to address three things, meaning or message slash purpose, indispensability, usefulness, necessity, and then the consequences of this case. With respect to meaning or message, I understood my friend, Ms. Black, to concede. She said it was absolutely true that you could consider meaning or message at factor one as part of the purpose inquiry. She said that. I took that to be a very big difference from what she said in her brief. In page two of her brief, she says it would be a fool's errand to conduct that analysis. And on page 22 of her brief, she says that courts are just incapable of doing this. I think that's a very significant concession, and we agree with that concession. We think that it in this case, or at least a vacator of the Second Circuit's ruling, because on pages 22 to 23 of the Second Circuit's analysis, I think they were unambiguously saying that courts cannot try to do this meaning or message inquiry. And then they go on to say, instead, you need to look at the degree of visual similarity. Now, I'm not sure what the government's position exactly is, whether they've made the same concession or not. As I understood the government's position with respect to purpose, they continue to hold the line that the level of generality has to be, these are two which I understand to mean that if you have two different portraits of Prince conveying very different meaning or messages, it doesn't matter. In other words, they would still excommunicate meaning or message from the factor one analysis. We don't think that's right. We don't think it's consistent with the text, Campbell, Google, all the things that we've already talked about. Secondly, with respect to indispensability, I understood my friend, Ms. Blatt, again, to concede that the position she took in her brief is not the right one, or at least to say she's fine with the much different and lower standard. She went from indispensability in the brief to usefulness here at oral argument. With respect to whether usefulness is required, a couple of things. First of all, Goldsmith herself conceded usefulness. And if you just look at page 76a of the petition appendix, the district court quoted her as conceding usefulness and even perhaps as conceding necessity. Secondly, usefulness, at least in the sense that it's been discussed here today, has not been briefed, has not been argued at any stage in the case. We heard a long colloquy on exactly what the varying different standards mean. If you thought that that was some sort of requirement, at a minimum, we would need to have a fair opportunity to satisfy that requirement once you tell us what the law is. As to what the law should be with respect to usefulness, we think the best way to look at this is it's a question of justification and the way you should get the answer to what kind of justification is required. If you look at Judge LaValle's article at page 1111, he talks about the justification for the message. We think that's what Campbell had in mind. Essentially, you're justified in borrowing, at least under Factor I, to some extent, if you're doing something more than just avoiding the drudgery of coming up with something new on your own. And finally, with respect to usefulness, just on the facts, we absolutely would satisfy this, not just because she conceded it, but because of course it's useful for an artist to use an artist's reference. The whole purpose of an artist's reference is to make use of that because it's useful in creating the work of art, the second work of art. So of course it was useful. Goldsmith herself concedes in her brief that we needed to use a picture of Prince. And I think both the government and Goldsmith said that, hey, they could have used any old picture of Prince. And the examples they give is to point to a bunch of other copyrighted pictures of Prince that appeared in our brief at pages 16 to 17. But it can't be the case that their answer is that we should have borrowed from someone else and then we'd be having the same case with a different photographer. I think the reality, Justice Alito, to your point, is any picture of Prince that was out there in 1984 when Warhol was creating this work, there's every reason to believe it would have been copyrighted. The copyright attaches in a photograph at the moment the photograph is taken, there's no reason to believe that there would have been any sort of non-copyrighted option. Finally, Your Honors, consequences. On consequences, it's really important to understand that the creation of the Warhol works is directly at play in this case. If you look at the request for relief, both sides requested essentially an adjudication of who owns the copyright. That turns on whether the Warhol acted lawfully or unlawfully at the moment of creation. We sought a declaratory judgment, we sought summary judgment as to all 16 works, not just the two works, orange and purple, that are at issue here. We sought a declaratory judgment as to all 16 works, we won that declaratory judgment, they appealed, and they got that victory overturned. Ms. Black says that she's in some other segments of the change the relief she was seeking. It doesn't matter. We sought a declaratory judgment on all 16 works, we won that, that's in play, and the creation matters. I think the other reason the creation matters, Justice Barrett, to your question is because it directly governs the display question when you're talking about museums. The reason a museum can display a work under Section 109 is because it was lawfully made. So the question is, at the moment it was lawful. The copyright question, who owns the copyrights here, turns on that. If Warhol infringed the copyright, it wasn't lawfully made. Your Honors, this case has implications beyond just Warhol. It affects all artists and especially contemporary artists. We ask you to reverse. Thank you, Counsel. The case is submitted.